Nott, J.,
delivered the opinion of the court:
When this case was first tried, it was held by this court that the administratrix, seeking as such to recover under the Abandoned or captured-property act, stood in the stead of the decedent, representing his rights,^ entitled to his equities, and subject to his disabilities ,• that her own interest in the estate as administratrix was simply representative, and that the rights of the real párties in interest could neither be aided nor de-, stroyed by her loyalty or disloyalty. We were not ignorant that at the common law an action of trespass or trover may be maintained by an administrator in whose name and from whose custody property has been taken, and that the common law regarded him as the technical legal owner; but we were at the same time aware that such actions were merely possessory, *592 while the statute under which we act does not award a cause of action to the person in possession of the captured property, or- entitled -to possession, but, on the contrary, bases such actions on “ ownership ” instead of on possession, and couples with u ownership ” an equitable right to the “ proceeds.”. Cases too, arose where a loyal decedent was represented by a disloyal administrator, and it seemed to us abhorrent to the just and equitable intent of the statute to allow the estate of a loyal citizen to be in effect confiscated because of the accident or chance of the administrator’s guilt. Referring to the analogies of the common law, we thought the closest to be. that of an executor under the ban of outlawry, who was allowed, nevertheless, to maintain his action, because in contemplation of law it was to protect the rights of others and not his own.
Of cases thus adjudicated by this court, two were taken to the Supreme Court. The first was that of Klein, administrator, (4 C. Cls. R.-, p. 559.) In it this court had found the decedent loyal and the administrator guilty of disloyal acts. Subsequently, on newly-discovered evidence, the court incorporated into its findings, by consent of parties, a finding that the decedent had been guilty of giving aid and comfort to the rebellion, but that he had taken the oath of amnesty before the seizure of his property, making the case, so far as his loyalty was concerned, identical with Padelford’s, (9 Wall. R., p. 531,) and leaving the position of the administrator precisely as it was before. In the Supreme Court the contest seems to have been entirely upon this amnesty of the decedent, and the decision of this court upon the point of the administrator’s guilt stands unquestioned and affirmed.
The second of the appealed cases is the one at bar. On the former trial it was found that the decedent had been guilty of giving aid and comfort to the rebellion, and it was held that the administratrix’s loyalty was immaterial,- notwithstanding that the seizure was subsequent to her administration. The Supreme Court has reversed this decision,-and now holds that the administratrix is the owner within the meaning of the act, and that, on proof of her loyalty the action may be maintained.
■From these decisions of the Supreme Court, it must be inferred that possession at the time of seizure is a controlling element to determine the ownership of captured property, and that the statute is to be construed thus : Where the property *593 was captured during tbe lifetime of a decedent, evidence ofbis loyalty is sufficient to maintain an action; but where the seizure was after administration, the loyalty of the decedent is immaterial, and the right to maintain the action depends upon the loyalty of the administrator.
So far as the mass of litigation is concerned, the decisions of the-Supreme Court on the effect of amnesty and pardon reuder this ruling comparatively unimportant; but it is not yet determined whether the doctrine of pardon and amnesty extends to resident aliens, to foreigners, or to those persons who died after the seizure of their property, but before they availed themselves of the proffered clemency, and before the general proclamation of 1868.
In the case now before us, the claimant seeks to recover the proceeds of three hundred and eighty-nine bales of cotton captured near Lewisburgh, Arkansas, which proceeds, it is claimed, amount to $125,628.
The cotton we find, after seizure, was taken to Little Bock, where it fell into three parcels:
1. One hundred and sixty-five bales were shipped from Little Bock in April, 1864. They bore the mark of the claimant’s cotton, “ <?. GY.;” they were described in the vouchers of the Treasury agent who shipped them as 11 from the abandoned plantation of George Carroll,” and they were sold in Cincinnati for $39,837.20, net.
2. Sixty-nine bales were mingled with other cotton, and formed part of a shipment of two hundred and thirty-eight bales which went forward in May, 1864. They are identified in the same manner, by the marks on tbe bales, and the description in the Treasury agent’s vouchers. . They were sold in Cincinnati for $450.39 a bale, net, amounting to $31,076.91.
3. One hundred and fifty-five bales, remaining at Little Bock, were seized by the military, and put into fortifications hastily thrown up on the occasion of an expected attack on that place. Of these one hundred and fifty five bales, only fifty-four could afterward be identified. At the same time other cotton had gone into the fortifications, and other cotton had come out of the fortifications, but the quantity which went in was five hundred and forty-two bales, while the quantity which came out was only three hundred and sixty-two bales, showing a loss of one hundred and eighty bales. It is insisted by the claimant that *594 sbe should recover for all of the cotton that came to the custody of the Treasury agent, irrespective of the use to which it was put and the loss which ensued; and by the defendants that she should recover only such proportion of the cotton saved as her cotton bore to that which went into the fortifications, irrespective of the portion which was afterward identified.
As to the claimant’s demand, we think that the loss of the cotton resulted from the appropriation of the property by the army; that we have not jurisdiction to afford relief; and that, as we have frequently held before, if there was a loss of captured property in mass which cannot be identified, all of the parties 'who held property affected by the disaster must contribute proportion ably to the loss. As to the position of the defendants that the proportion to be recovered must be estimated irrespective of the portion identified, we think it is too restrictive; for if, for illustration in this case, one hundred of the one hundred and fifty-five bales had been identified, that quantity would exceed the proportion which the defendants -propose to assig'n to the claimant. The better and more general rule would seem to be that where a mass of property belonging to several owners has been in part destroyed, that which is saved should be awarded to the respective owners, so far as it can be identified, and the remainder, which cannot be identified, should be proportioned among all in the ratio that each contributed to it.
Applying this rule to the case before us, we find that there went—
Into fortifications. 542 bales — 114 identified=428
Came out.. 362 bales — 114 identified=248
Giving as number lost... 180
which is equivalent to The claimant, then, should recover for—
Identified cotton. 54 bales.
Proportion of 101 unidentified, (Ts^-). 59 bales.
Total.,. 113 bales.
But the three hundred aud sixty-two bales of cotton which left Little Bock were subjected to further losses, so that but *595 two hundred and seventy-seven reached Saint Louis. As the missing bales cannot be identified, the claimant must share in this additional loss. The two hundred and seventy-seven bales brought $71,888.68 net, whereof the claimant’s proportion will be only $198.58 per bale; for one hundred and thirteen bales, $22,439.54.
The judgment of the court is, that the claimant recover the proceeds in the Treasury of—
165 bales of cotton sold at Cincinnati. $39, 837 20
69 bales of cotton sold at Cincinnati. 31,076 91
113 bales of cotton sold at Saint Louis. 22,439 54
Amounting in the aggregate to.. 93, 353 65